St. Andrews Development Co., Inc. d/b/a Governours Place Apartments; Arthur Nemroff, President and Mary Elliott, Rental Agent, Appellants, *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission, Appellee.

Argued June 4, 1973, before Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. President Judge BOWMAN did not participate.

*Harry B. Goldberg,* with him *Goldberg, Evans & Katzman,* for appellants.

*Sanford Kahn,* General Counsel, with him *Robert Englesberg,* Assistant General Counsel, and *Israel Packel,* Attorney General, for appellee.

OPINION BY JUDGE KRAMER, August 14, 1973:

This is an appeal from a final order, dated December 26, 1972, of the Pennsylvania Human Relations Commission (Commission) in which Arthur Nemroff (Nemroff) and Mary Elliott (Elliott) were ordered to cease and desist from committing any unlawful discriminatory practices as defined in Section 5(h) of the Pennsylvania Human Relations Act, Act of October 27, 1955, P. L. 744, as amended, 43 P.S. §955(h), in renting or offering to rent any apartment unit or units under their control. They were also ordered to cease and desist from utilizing a financial criterion, in a discriminatory manner, in the leasing of apartments. Nemroff was ordered to pay to Geraldine Cobb the sum of $750 to compensate her for mental anguish, humiliation and embarrassment, and to the Estate of Martha Cobb, deceased, a sum of $750 as compensation for mental anguish, humiliation and embarrassment she experienced during her lifetime as a result of unlawful discriminatory practices inflicted upon her by Nemroff.

The pertinent facts are that Martha Cobb (deceased) and her daughter, Geraldine Cobb, then a minor of the age of 20 years,[1] on November 4, 1971, made applica-

---

[1] The Act of June 16, 1972, P. L.    , Act No. 151, lowered the age of majority for contract purposes; but this was subsequent to the pertinent events involved in this case.

tion with the St. Andrews Development Company, Inc., trading and doing business as Governours Place Apartments, to rent an apartment for themselves and a minor son (age 6) of Martha Cobb, at a monthly rental of $240. The Governours Place Apartments is a multi-million dollar apartment complex, still under construction at the time of the hearing, but when completed, will contain 130 apartment dwelling units in seven buildings. Nemroff is president of the corporation (St. Andrews), and apparently is the operating official who makes the decisions on whether applications for apartments are approved or disapproved. Elliot is the resident manager of the apartment complex, who shows the apartments and receives applications for same, which applications are sent on to the Philadelphia office of St. Andrews for approval or disapproval. After obtaining the signatures, of both Geraldine and Martha Cobb, to the application, Elliot transmitted the application together with one month's rental to the corporate office of St. Andrews. After several phone calls by Martha Cobb making inquiry about the status of their application, she received a letter on November 24, 1971, advising her that her application was not accepted and refunding to her the one month's rental. Prior to that letter, on November 15, 1971, Martha Cobb signed a complaint against St. Andrews, Nemroff and Elliot alleging that she had been refused the opportunity to rent an apartment in the Governours Place complex "because of her race, Negro." On December 14, 1971, at the request of officials of the Commission, Nemroff met with them to discuss the complaint. On January 21, 1972 (the record also states January 27, 1972), Martha Cobb died. On February 11, 1972, Geraldine Cobb signed an amended complaint wherein she appeared, for the first time, as a complainant; and whereon a notation was made that Martha Cobb was

deceased. The amended complaint alleges an unlawful discriminatory practice took place "on or about November 15, 1971" and alleges a violation of "Section 5(h) (1) of the Pennsylvania Human Relations Act." The record discloses that at the time of the hearing, three applications of non-whites had been submitted to St. Andrews for apartments at Governours Place. One was from a Black-Chinese couple, whose application was approved, another involved a Black school teacher, whose income did not meet the financial criterion established for tenants in Governours Place, and the third was the Cobb application.

As stated in the Act (43 P.S. §960), our scope of review is governed by the Administrative Agency Law, Act of June 4, 1945, P. L. 1388, as amended, 71 P.S. §1710.1 et seq. whereby we are to determine whether the Commission's adjudication "is not in accordance with law" or whether "any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence." *See also Wilkinsburg School District v. Human Relations Commission,* 6 Pa. Commonwealth Ct. 378, 295 A. 2d 609 (1972); *Pennsylvania Human Relations Commission v. Chester School District,* 209 Pa. Superior Ct. 37, 224 A. 2d 811 (1966).[2] We also note that simultaneously with the filing of this opinion, we have filed two other opinions in related matters. They are *Zamantakis v. Pennsylvania Human Relations Commission,* No. 1300 C.D. 1972 and *Straw v. Human Relations Commission,* No. 16 C.D. 1973. When defining substantial evidence, this Court has said in *A. P. Weaver & Sons v. Sanitary Water Board,* 3 Pa. Commonwealth Ct. 499, 505, 284 A. 2d 515, 518 (1971): " ' "[S]ubstantial evidence" should be construed to confer finality upon an administrative decision on the facts when, upon an examination

---

[2] *Modified,* 427 Pa. 157, 233 A. 2d 290 (1967).

of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside.' " (Emphasis in original.)

The respondents raised one rather broad issue, and that is whether the findings of fact made by the Commission, and necessary to support its adjudication, are supported by substantial evidence. The respondents contend that the record shows a lack of discrimination. They base their argument upon the use of two criteria which provided the basis for disapproving the Cobb application. First, the respondents state that they did not accept an application from anyone who had minor children who would be left alone for a period of time regularly, without supervision; and secondly, that it was a requirement for all tenants that their weekly gross pay must be equal to, or in excess of, the monthly rental. With regard to the first contention, the record does not establish that there was any other tenant in Governours Place who had minor children, who regularly would be left unattended. The record does establish that Martha Cobb and Geraldine Cobb both worked at different times, which would have made it possible for the minor son of Martha Cobb to be left unattended for about two hours each working day. There is some testimony concerning an uncle of Geraldine Cobb who lived nearby and who may have been available as a babysitter, but this is inconsequential. Our careful reading of the record in this case permits us to conclude that there is not substantial evidence in the record to indicate racial discrimination, based upon this first proposition.

With respect to the second contention, i.e., the financial responsibility criterion, we note that Finding No. 16 of the Commission's adjudication acknowledges that the respondents did have a general policy applicable to *all* tenants, but adds that the combined earnings of Geraldine and Martha Cobb were in excess of the established minimum financial requirement. Respondents answered this contention in the record by stating that they discounted the income of Geraldine Cobb for the reason that she was a minor, and had worked for only three or four months prior to the submission of the application. The record discloses that the respondents had waived the financial responsibility criterion, to some extent, for at least two tenants, but these waivers were satisfactorily described by respondents not to be really exceptions to the general rule.

The record also discloses that prior to the moving in of the Black-Chinese couple, Elliot communicated with other tenants in the complex to advise them of the addition of the Black-Chinese couple, and to seek their reaction to such information. Although the respondents say this action was as much for the benefit of the new tenants as for the old tenants, that is, so they could advise the new tenants of any adversity, this action of the respondents is certainly suspect. This action on behalf of respondents is sufficient substantial evidence to support the Commission's conclusion that the respondents did commit a violation of the Human Relations Act (Section 5(h)(6)). Unfortunately, however, the complaint against the respondents alleges a violation only of Section 5(h)(1) of the Act, which is specifically related to the refusal "to sell, lease, finance or otherwise to deny or withhold commercial housing from any person because of race. . ." etc. The technical violation of the respondents is found in Section 5(h)(6) of the Act which prohibits the making of

"any inquiry, elicit any information, make or keep any record or use any form of application, containing questions or entries concerning race. . . ." As we stated in *Straw, supra,* proceedings before the Human Relations Commission are subject to all of the requirements of due process of law. One of these requirements is that the respondents be given notice of the violation for which they are charged. In view of the fact that the complaint did not allege the violation of 5(h)(6), the Commission's conclusion that the respondents were in violation thereof, although correct, is ineffective. The Commission would have us ignore the requirement of due process, stating that the pleadings before the Commission "are customarily drafted by laymen." We recognize that administrative agencies are not held to the same strict procedural adherence as in a court of law, but we know of no case which would permit the denial of due process by virtue of the more informal administrative procedure.

Because of the importance of this case, we have read and reread very carefully the entire record to determine whether the Cobb application was disapproved because of their race. At the time of the hearing, Martha Cobb had died. The other complainant, Geraldine Cobb, did not make one specific statement explaining why she believed she had been refused a lease because of her race. The other Commission witnesses likewise did not make any such statement. As a result the Commission's entire adjudication is based upon inferences. We recognize that in human relations cases it is rare for the respondent to have made positive statements or to have performed patent acts of discrimination; and therefore, many cases must be resolved by findings of discrimination based upon inferences and circumstantial evidence. Complainants often build their prima facie cases upon inferences, resulting from the respond-

ents' acts or words. However, such permitted inferences must be based upon some objective evidence rather than purely subjective evidence. In this case the Commission applied solely its own subjective test of what it believed was in the minds of *both* the complainants and the respondents. This is not a case where the landlord denied all Blacks who applied for a lease, or waived the requirements for all Whites (or even a Commission "tester") after refusing the complainant, nor is it a case where requirements for applicants were fabricated, any one of which circumstances could permit an inference of discrimination on an objective test. This is a case where the landlord denied a lease for reasons which were reasonably applicable to all applicants, regardless of race. Furthermore, we cannot read into the statute a legislative intent to permit the Commission to find discrimination based solely upon a complainant's feelings. There are many situations wherein a person may be upset, or feel discriminated against; but which are not, in fact or law, illegal discriminations. We hold that the record in this case does not establish sufficient evidence which could be characterized as substantial evidence to support a finding and conclusion of an illegal discrimination.

In passing, we must mention the award by the Commission of $750 each to Geraldine Cobb and to the Estate of Martha Cobb. There is no explanation in the record setting forth the Commission's authority to award compensation for mental anguish, humiliation and embarrassment to the Estate of the deceased Martha Cobb. How the Commission could determine that she had mental anguish, humiliation and embarrassment when the hearings were held after her death is left unanswered. To be sure, there is testimony by Geraldine Cobb that her mother was upset prior to her death over the disapproval of their application; but the

record also discloses that Martha was upset over her desire for the apartment and not over a racial conflict. The testimony does not in any way support the award made by the Commission. Furthermore, there is not any mention in the record whether there ever was appointed a personal representative, either by Letters Testamentary or Letters of Administration for the Estate of Martha Cobb. To whom this money was to be paid remains a mystery. In any event, in *Zamantakis v. Pennsylvania Human Relations Commission, supra,* a companion case, we have held that the Commission does not have statutory authority to award compensation, or compensatory damages, to a complainant. The reasoning we used there is equally applicable here.

In summary, then, in view of our holding that there is not substantial evidence to support the findings and conclusions of the Commission, we must set aside the entire order of the Commission dated December 26, 1972. We therefore

## ORDER

AND Now, this 14th day of August, 1973, it is ordered that the Final Order, dated December 26, 1972, of the Pennsylvana Human Relations Commission, in the above case is hereby set aside.

---

CONCURRING OPINION BY JUDGE BLATT:

I agree with the holding of the majority herein that there was insufficient evidence to support a finding and conclusion that an unlawful discriminatory practice occurred. I see no necessity, therefore, to consider the power of the Pennsylvania Human Relations Commission to award damages. Because the majority has considered that subject, however, my concurrence is subject to the reservations expressed in my Concurring Opinion in *Zamantakis v. Pennsylvania Human Rela-*

*tions Commission,* 10 Pa. Commonwealth Ct. 107, 308 A. 2d 612 (1973).

---

CONCURRING AND DISSENTING OPINION BY JUDGE ROGERS:

For the reasons set forth in my dissent in the case of *Zamantakis v. Pennsylvania Human Relations Commission,* 10 Pa. Commonwealth Ct. 107, 308 A. 2d 612 (1973), No. 1300 C.D. 1972, I respectfully dissent from the holding of the court that the Pennsylvania Human Relations Commission may not order the payment of compensatory damages to the victim of a discriminatory practice. I would therefore affirm the Board in its order with respect to Geraldine Cobb. I would modify the order so as to strike down the award to the non-existent Estate of Martha Cobb, for the reasons set forth in the majority's opinion.